```
              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF OHIO
                   WESTERN DIVISION
```

UNITED STATES OF AMERICA,  :  NO. 1:05-CR-00180

v.  :  **ORDER**

CHRISTOPHER SADDLER.  :

This matter is before the Court on Defendant's Motion to Suppress (doc. 21) and the United States' Response (doc. 22). The Court held a hearing on such Motion on February 15, 2006. For the reasons indicated herein, the Court DENIES Defendant's motion.

**I. Background**

This matter pertains to the warrantless stop of Defendant by Cincinnati Police Officers on September 27, 2005, which Defendant contends was not based on reasonable suspicion and therefore violated his Fourth Amendment right to be free of unreasonable search and seizure. Defendant seeks to suppress the firearm, a Cobray Mack Eleven semiautomatic, seized incident to his stop and seizure because he argues the police had no justification to stop him.

At the February 15, 2006 hearing, Cincinnati Police Officers Eric Schaible and Thomas Weigand testified as to the events leading to their arrest of Defendant, events that from start to finish took two to three minutes. At approximately 1:00 A.M. on September 27, 2005, the officers were patrolling their assigned District Four neighborhood, which they both identified as a high-

crime neighborhood with drug trafficking and violent crime. Officer Weigand drove the marked police cruiser, turned southbound onto Burnet Avenue from Forest Avenue, and both officers testified that immediately their eyes focused on 3501 Burnet, an apartment building at the end of the block, on the corner of Rockdale Avenue. Officer Schaible testified that he had made numerous arrests for drugs and guns at 3501 Burnet, and that the address is the subject of many radio runs for drug trafficking, shots fired, and criminal trespass complaints. Officer Weigand testified that it is his practice to always look at the apartment building at 3501 Burnet. Moreover, Schaible testified, the owner of the building, Hari Ramineni, had requested by letter police assistance in enforcing criminal trespassing laws at 3501 Burnet. The letter asks Cincinnati Police to warn those who trespass to leave the property, and to arrest repeat violators.

Both officers testified that as soon as they saw the building at 3501 Burnet that night, they observed four people on the front stoop or breezeway of the building, standing in a tight circle. As the officers approached the building in their cruiser three of the people ran into the building, while the fourth, Defendant, started to quickly walk southbound on Burnet Avenue. The officers did not pursue the three individuals who fled into the building.

Defendant, who was wearing a backpack, continued to walk until he reached the corner of Burnet and Rockdale. At this point, Schaible, who had exited the cruiser, walked up behind Defendant

and told him to stop. Defendant ignored Schaible and continued to walk. According to Schaible, Defendant continued ten to fifteen feet, Schaible raised his voice, asked Defendant to stop multiple times, and then demanded that Defendant stop. Then, according to both officers, Defendant stopped, at least "initially" so as to turn around and hand his identification card to Officer Schaible. Defendant became very irate and started yelling that the Officers should run his identification through the computer, that they had no right to stop him, and that he had done nothing wrong. Defendant continued to back away from Schaible, about five feet according to Schaible, and up to ten feet according to Weigand. Officer Weigand parked the cruiser and crossed over to join Schaible. Schaible states Defendant was acting very nervous after he produced the identification. Schaible states he advised Defendant he would pat Defendant down for weapons, at which point Defendant "backpedaled" and told Schaible there was no reason to touch him. Schaible testified that Defendant's actions, the high crime area, and the fact that the other three individuals had fled the area led Schaible to believe Defendant might possibly be armed.

      Neither officer looked at Defendant's identification to verify whether his address was at 3501 Burnet, which would have been an obvious method to check whether he was trespassing. Defendant continued to protest that the Officers had no right to stop him and continued to back away from Officer Schaible.

      Schaible grabbed Defendant by the arm of Defendant's shirt so as to stop Defendant. Defendant tried to pull away from

3

Officer Schaible. When Weigand saw Defendant pulling away from Schaible, Weigand grabbed Defendant by the right side of Defendant's arm and by Defendant's backpack. When Weigand grabbed the backpack, he immediately felt what he believed to be the barrel of a firearm. Weigand mouthed to Schaible the word "gun." The Officers then struggled with Defendant so as to handcuff him, and had to take Defendant to the ground in order to restrain him.

After they handcuffed Defendant, Weigand opened the backpack and found the gun. The officers ultimately charged Defendant under Ohio law for carrying a concealed weapon, for resisting arrest, and for having a weapon under a disability. The officers did not charge Defendant for trespass, their stated basis for investigating him. Schaible testified that it was their practice to charge a person for trespass only after the person had been warned to stay off the property. Neither Schaible nor Weigand had ever warned Defendant to stay off the property at 3501 Burnet. Weigand testified that Defendant was not charged for trespass because it was a lesser misdemeanor offense, and Defendant was facing other felonies.

At the February 15, 2006 hearing, Defendant argued that the officers in this case did not see him possess a weapon, participate in any drug transaction, or commit any crime. Therefore, in Defendant's view, his stop and detention were improper. Defendant argued that rather than pursuing the three individuals who ran into 3501 Burnet, which would have been justified, the officers chose to pursue Defendant who was simply

4

walking down the street. Defendant argued that the officers did not warn him of trespass, and ultimately did not charge him for trespass, even though this was their justification for stopping him in the first place. Further, Defendant contends he provided his identification and merely expressed his constitutional right to be left alone absent reasonable suspicion.

As a policy argument, Defendant contends that after the killing of Timothy Thomas in 2001, which sparked riots in the City of Cincinnati, city leaders have consistently urged young black men, "if the police stop you, don't run, give them your I.D. and give them your name." Defendant argues such advice is targeted at the most at-risk group of people in our city, so as to decrease the confrontation risk they might face in interaction with law enforcement. Defendant argues in this case he did just this, and law enforcement officers now want to characterize him as belligerent for asserting his rights.

The government contends that Defendant did not just stop and proffer his I.D., but rather continued to try to leave, exhibited nervous behavior, and tried to evade the officers. The government argues the officers had the right to detain Defendant to question whether he had a right to be on the property. It argues it was never able to conclude its investigation because Defendant kept pulling away and trying to leave the scene. It argues there was no pat-down in this case, because the officers were merely trying to effectuate an investigative stop, which Defendant resisted, resulting in discovery of the firearm by a plain touch of

5

his backpack.

**II. The Fourth Amendment**

Governmental detentions of persons, including arrests, constitute seizures, and as such must be reasonable under the Fourth Amendment. Similarly, evidentiary searches and seizures must be reasonable to be valid under the Fourth Amendment.

**A. Detentions of Persons**

There are essentially three types of encounters that can occur between a citizen and a police officer: a consensual encounter, an investigative Terry-type stop, and an arrest. See United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989). A consensual encounter can occur without any suspicion or justification, while an arrest can take place only if the police have probable cause to believe the individual has committed or is committing a crime. Beck v. Ohio, 379 U.S. 89 (1964). The investigative stop falls on the continuum between these two, and allows for police to briefly detain a person for investigative purposes even if they lack probable cause to make an arrest. Terry v. Ohio, 392 U.S. 1 (1968).

**1. A Consensual Encounter**

Law enforcement officers do not violate the Fourth Amendment by merely approaching a person on the street or in another public place, by asking him if he is willing to answer some questions, or by putting questions to him if the person is willing to listen. Dunaway v. New York, 442 U.S. 200, 210 (1979). The person approached, however, need not consent to questioning; indeed

he may decline to listen to the questions at all and may go on his way. Terry, 392 U.S., at 32-33 (Harlan, J., concurring). He may not be detained even momentarily without reasonable, objective grounds for doing so, and his refusal to listen or answer does not, without more, furnish those grounds. United States v. Mendenhall, 446 U.S. 544, 555 (1980). Absent the prerequisite of reasonable suspicion, law enforcement officers have no right to pat down or frisk the outer clothing of passers-by or persons to whom they address casual questions. United States v. Mayo, 361 F.3d 802, 806 (4th Cir. 2004)(quoting United States v. Burton, 228 F.3d 524 (4th Cir. 2000).

**2. A Terry Investigative Stop**

In Terry, the officer observed two individuals pacing back and forth in front of a store, peering into the window, and periodically conferring. 392 U.S. at 5-6. The conduct observed was lawful, but it also suggested the individuals were casing the store for a planned robbery. The Terry decision recognized that the officer could detain the individuals to resolve the ambiguity. 392 U.S. at 30.

To make an investigative stop, police must have reasonable suspicion supported by articulable facts that criminal activity may be afoot. United States v. Sokolow, 490 U.S. 1, 7 (1989). If the police also have a reasonable suspicion to believe that the detainee is armed and dangerous, they may also conduct a "frisk," a limited search, to ensure the detainee has no weapons.

Terry, 392 U.S. at 24, Adams v. Williams, 407 U.S. 143, 146 (1972).

In reviewing the legality of Terry stops, courts must consider the "totality of the circumstances" of each case, so as to determine whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002). Relevant to the totality of the circumstances are various factors, such as whether the stop occurred in a high-crime area, Illinois v. Wardlow, 528 U.S. 119, 124 (2000), or whether the suspect engaged in evasive behavior or acted nervously, Id., United States v. Brigoni-Ponce, 422 U.S. 873, 885(1975), United States v. Sokolow, 490 U.S. 1, 8-9 (1989), United States v. McFarley, 991 F.2d 1188, 1192 (4th Cir. 1993)(identifying as "unusually nervous" such behavior as shaking hands, heavy breathing, and providing inconsistent answers). A suspect's refusal to cooperate with police, without more, does not satisfy Terry stop requirements. Wardlow, 528 U.S. 119, 125. When an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has the right to ignore the police and go about his business. Florida v. Royer, 460 U.S. 491, 498 (1983). But evasive actions taken by an individual are relevant in determining whether an officer has reasonable suspicion. United States v. Sharpe, 470 U.S. 675 (1985). Although flight alone may not support a finding of reasonable suspicion, flight is certainly a relevant and probative factor. Id. Unprovoked flight is not merely a refusal to cooperate, it is actually the opposite of "going about one's business." Wardlow, 528 U.S. 119, 125.

8

"Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning." Id.

A determination whether reasonable suspicion exists must give due weight to common sense judgments reached by officers in light of their experience and training. Arvizu, 534 U.S. 266, 273 (2002)(officers draw on their experience and training to make inferences from and deductions about cumulative information available to them), United States v. Carthorn, No. 93-6593, 1994 U.S. App. LEXIS 24582, *15 (6th Cir. September 8, 1994) (per curiam)(finding reasonable suspicion based on Defendant's presence in the back seat of a car in a known drug area at 4:00 A.M. and due to the fact that the officer had made previous arrests at the same location), United States v. Perkins, 363 F.3d 317, 321 (4th Cir. 2003)(noting that the officer's familiarity with the high crime and drug trafficking nature of the neighborhood were important factors in the reasonable suspicion analysis). The determination of the reasonableness of a Terry stop also "must embody the allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 386-87 (1989).

In permitting such detentions, the law accepts the risk that officers may stop the innocent. Wardlow, 528 U.S. at 126.

9

"Indeed the Fourth Amendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent," states the Wardlow court, "The Terry stop is a far more minimal intrusion, simply allowing the officer to briefly investigate further." Id.

There is no hard and fast time limit for a permissible Terry stop, but "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. at 500. If an investigative stop persists indefinitely, at some point it can no longer be justified as a minimally intrusive investigative stop. United States v. Sharpe, 470 U.S. 675, 685 (1985). Refusal to cooperate with an investigative stop can justify a physical restraint of the suspect. Tom v. Voida, 963 F.2d 952, 957 (7th Cir. 1992)(handcuffing of a suspect can be justified as incident to an investigatory stop).

**B. Searches and Seizures of Evidence**

To be reasonable under the Fourth Amendment, most searches must be pursuant to a warrant. However, there are a number of exceptions, including those under the "plain view" and "plain feel" doctrines. In Minnesota v. Dickerson, 508 U.S. 366, 375 (1993), the Supreme Court expanded the plain view doctrine to tactile discoveries. The plain view doctrine allows for the seizure of evidence whose incriminating character is immediately apparent when the officers have a lawful right of access to the

10

object.  Horton v. California, 469 U.S. 128, 136-37 (1990).  In Dickerson, the high Court found that where an officer "lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain view context." 508 U.S. at 375-376. Police may also conduct a warrantless search incident to a lawful arrest.  Chimel v. California, 395 U.S. 752, 763 (1969), United States v. Robinson, 414 U.S. 218 (1973).

**III. Discussion**

The question in this case is whether the officers had a reasonable suspicion justifying an investigative stop of Defendant. If the officers were justified in their stop of Defendant, then the discovery of the incriminating evidence as they attempted to effectuate the stop was proper.

Having reviewed this matter, the Court finds the officers had a reasonable suspicion to stop Defendant for questioning based on the totality of the circumstances.  An objective officer when confronted with a group of people in a high-crime area, who immediately disperse when they see law enforcement, has a reasonable basis to believe that criminal activity is afoot.  As Defendant's counsel stated at the hearing, "flight plus a bad area equals probable cause."  Of course the threshold requirement in this case is lower than probable cause; it is merely reasonable

11

suspicion.

Defendant characterizes the movement of the three individuals who ran into the building to equate "flight," but attempts to characterize Defendant's movement as if he was merely walking down the street going about his own business. However, all of the movement, whether the running of the three individuals or the brisk walking of Defendant, was triggered by the arrival of the police cruiser on the scene. Had the group stayed on the front stoop at 3501 Burnet going about their late night business, there would be one less factor supporting a finding of reasonable suspicion under the totality of the circumstances. The movement f all four individuals, including Defendant, could be viewed as evasive by an objective officer. Wardlow, 528 U.S. 119, 125, Michigan v. Chesternut, 486 U.S. 567 (1988)(Kennedy and Scalia, JJ., concurring)("respondent's unprovoked flight gave the police ample cause to stop him."), but see California v. Hodari D., 499 U.S. 621, 624, n.1 (1991)(reserving the question whether the police may question those who do nothing more than "scatter in panic upon the mere sighting of the police,").

The officers here had more to support their stop of Defendant for questioning. They both knew the particular address was, to put it mildly, a problem spot, and they had made previous arrests there for drug and weapons activity. It was late at night. United States v. Brown, 334 F.3d 1161, 1165 (D.C. Cir. 2003)(the fact that a stop occurred in a high crime area "is further compounded by the lateness of the hour"), United States v. Lender,

12

985 F.2d 151, 154 (4th Cir. 1993)(noting "the lateness of the hour is another fact that may raise the level of suspicion"). The officers also sensed that Defendant was nervous. Although Defendant might characterize his verbal protests as a mere expression of his constitutional rights, the very fact that he was yelling could lead a reasonable officer to conclude Defendant was unusually nervous. Moreover, Defendant paused to proffer his identification, but continued to backpedal in the presence of the officers. Defendant's body language, which the officers read, showed nervous and evasive behaviors. Such behaviors are hallmarks justifying a reasonable suspicion. Wardlow, 528 U.S. 119, (2000), Brigoni-Ponce, 422 U.S. 873, 885 (1975), Sokolow, 490 U.S. 1, 8-9 (1989). All of these factors, independent of the fact the officers in this case had been requested by the landowner to monitor the location for trespassers, show the officers acted reasonably under the circumstances.[1]

When an officer is justified in believing that the individual who he is investigating at close range is armed and presently dangerous he may pat the suspect down for weapons. Adams, 407 U.S. 143, 146. Here, Officer Schaible concluded he was

---

[1] Although the officers testified that it is their practice to warn trespassers to leave a property before arresting them, and Defendant makes much of the fact that he received no warning, the circumstances of this case involve other facts than merely a possible violation of Ohio Rev. Code 2911.21. Had Defendant engaged in dialogue with the officers he may have received a warning consistent with the officers' practice. The Court notes that the Ohio statute includes no requirement of such a warning prior to its enforcement, where, as in this case, a sign is conspicuously posted that prohibits trespass. O.R.C. 2911.21(A)(4).

justified in conducting such a frisk based on Defendant's evasive and nervous behavior, the high crime area, and the flight of the other three individuals. The Court will not second-guess this conclusion in what was clearly a rapidly developing situation. However, although Schaible verbally instructed Defendant that he intended to conduct a frisk, he never got to the point where he could, because Defendant resisted. In the ensuing scuffle Weigand felt the gun. The Court finds well-taken the government's position that the officers were justified in physically stopping Defendant for questioning. When Defendant continued to backpedal, to evade questioning, and not permit the officers to conduct an investigation, then the officers here were justified in restraining him. Had Defendant stood his ground and not exhibited nervous and evasive behavior, the outcome of this case very well might have been different under a totality of the circumstances analysis. The gun was found consistent with the "plain feel" doctrine, and there is no basis to suppress it as evidence from this case.

        The Court is sympathetic to Defendant's policy argument that young black men in Cincinnati should be encouraged to cooperate with police so as to avoid creating risky confrontations. The Court agrees that to a certain extent, Defendant in this case cooperated by proffering identification and not outright running. However, Defendant's other nervous and evasive behaviors, and the fact he was in the wrong place at the wrong time, rightly created a reasonable suspicion justifying his stop by the officers. Indeed, should Defendant have stood his ground and calmly engaged

14

in dialogue with the police, he very well may not have been seized and ultimately arrested. If Defendant had been seized and arrested under this alternative scenario of calm dialogue, it is unlikely the Court could deny a motion to suppress.

**IV. Conclusion**

For the reasons indicated herein, the Court does not find well-taken Defendant's arguments in support of his motion. Accordingly, the Court DENIES Defendant's Motion to Suppress (doc. 21).

SO ORDERED.

Dated: February 28, 2006      /s/ S. Arthur Spiegel
                              S. Arthur Spiegel
                              United States Senior District Judge